```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA,

 4           Plaintiff,
                                        Criminal Action
 5        vs.
                                        No. 19-115
 6   TAL PRIHAR,

 7           Defendant.
     _____

 8

 9

10        Transcript of CHANGE OF PLEA Proceedings on March 31,
     2021, United States District Court, Pittsburgh,
11   Pennsylvania, before The Hon. Donetta W. Ambrose, United
     States District Judge.

12

13

14   APPEARANCES:

15   For the Government:      Jessica Lieber Smolar, Esq.

16
     For the Defendant:       Michael A. Comber, Esq.
17                            Stephen Wesley Gorman, Esq.

18

19
     Court Reporter:          Amanda M. Williamson, RMR, CRR
20                            6260 Joseph F. Weis Jr. US Courthouse
                              Pittsburgh, PA  15219
21                            (412) 600-6607

22

23   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription
24

25
```

```
 1                    P R O C E E D I N G S
 2          (Proceedings held via Zoom; March 31, 2021.)
 3              THE COURT:  Good morning, everyone.  I'm sorry,
 4     Susan, I was a little late coming on.  It was because I
 5     pressed the wrong Zoom meeting, the one from yesterday.  So
 6     I apologize.  But I'm here now, and we are here in the case
 7     of the United States of America against Tal Prihar at
 8     Criminal No. 19-115.
 9              And as everyone knows from the notices that go up,
10     recording of the Zoom proceeding is prohibited.  So we're
11     ready to start this morning.  And, Mr. Prihar, would you
12     raise your right hand, please.
13          (The defendant was sworn.)
14              THE COURT:  Mr. Prihar, before we proceed with
15     your change of plea hearing today, I want to acknowledge for
16     the record that we are proceeding today by video conference.
17     At present, you are located at the Butler County Jail, and
18     you are participating by video link; is that correct?
19              THE DEFENDANT:  Yes, Your Honor.
20              THE COURT:  Okay.  Your attorney, Mr. Comber, is
21     also present by video link, as is the Assistant United
22     States Attorney, Ms. Smolar.  I am also present by video
23     link, as is my staff and the court reporter.
24              These proceedings are being transcribed by the
25     court reporter the same as though we were all physically
```

1  present in the courtroom.  Now, if at any time during this
2  proceeding, you need to speak to Mr. Comber privately, all
3  you have to do is ask; and we can arrange that.
4        Do you understand that today's plea hearing will be
5  received through video conference to secure your testimony
6  and the testimony of all others?
7            THE DEFENDANT:  Yes, Your Honor.
8            THE COURT:  We are proceeding with video
9  conference due to limitations presented by the COVID-19
10 virus pandemic and by virtue of an administrative order
11 entered in this district by our Chief Judge, Mark Hornak.
12        In addition, pursuant to a motion filed on your
13 behalf and consented to by the government, we are convened
14 for a video conference to receive your change of plea in
15 this case.
16        Since this matter involves a hearing for a felony
17 offense, I am required to determine the existence of
18 specific reasons that this plea cannot be further delayed
19 without serious harm to the interest of justice.  I
20 acknowledge the timely processing of cases ready to move
21 forward towards resolution furthers the interest of justice
22 and reduces undue burdens on the court and the criminal
23 justice system during this pandemic.
24        Defendants and the public are well-served to move
25 forward towards timely disposition of each case.  Therefore,

1  given the disruption in criminal and civil case processing

2  and the building backlog of cases during the pandemic, this

3  matter presently ready to move forward cannot be further

4  delayed without serious harm to the interest of justice.

5          Now, I'll ask counsel first for the government, are

6  there any other reasons you wish to present on the issue of

7  necessity to move forward in the interest of justice?

8          MS. SMOLAR:  Nothing further, Your Honor.

9          THE COURT:  Mr. Comber?

10          MR. COMBER:  No, Your Honor.  Thank you.

11          THE COURT:  Okay.  Now, Mr. Prihar, due to this

12  proceeding being conducted by video conference today, we

13  have been unable to provide you with physical forms for your

14  signature.  Now, Mr. Comber, I know there were some issues

15  about whether or not you were going to get the forms to him.

16  Did you, in fact, or am I going to ask him to authorize you

17  to sign them today?

18          MR. COMBER:  No, Your Honor.  We met and provided

19  him with the forms.  He signed, and I have forwarded them

20  on.

21          THE COURT:  Okay.  So that has been done, right,

22  Mr. Prihar, you have signed the necessary forms for today?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Okay.  Thank you.  Mr. Prihar, you

25  have the right to request that this proceeding be continued

1  until a later date when circumstances can permit your

2  physical presence in court for that purpose.  Do you

3  understand that you are not required to proceed through

4  video conference?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Do you consent to proceeding by video

7  conference hearing today?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Do you have any questions at all about

10  what I have just discussed with regard to video conference

11  hearings?

12          THE DEFENDANT:  No, Your Honor.  All is clear.

13          THE COURT:  I then find that the interest of

14  justice supports proceeding today by way of video conference

15  and that Mr. Prihar has consented to entering his change of

16  plea through this method of court appearance and

17  presentation.

18          Now, Mr. Prihar, I have been informed that you wish

19  to change the plea you previously entered at Count 1 of this

20  indictment to a plea of guilty.  Is that correct?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Before accepting your guilty plea,

23  there are a number of questions that I'm going to ask to

24  make certain that your plea is valid.  If you do not

25  understand any question I ask you, please let me know; and I

1  will explain it to you.

2        If at any time you wish to consult with your

3  attorney, let me know that; and I'll give you as much time

4  as you need to consult with him.  I give you these

5  instructions because it is essential to a valid plea that

6  you understand every question before you answer.  Would you

7  please state your full name.

8        THE DEFENDANT:  Tal Prihar.

9        THE COURT:  How old are you, sir?

10       THE DEFENDANT:  39.

11       THE COURT:  How far did you go in school?

12       THE DEFENDANT:  To 12th grade.

13       THE COURT:  Do you have any difficulty reading,

14 writing, or understanding the English language?

15       THE DEFENDANT:  No, Your Honor.

16       THE COURT:  Mr. Comber, have you had any

17 difficulty communicating with Mr. Prihar?

18       MR. COMBER:  No, Your Honor.

19       THE COURT:  Mr. Prihar, have you taken any drugs

20 or medicine or drunk any alcohol in the past 24 hours?

21       THE DEFENDANT:  No, Your Honor.

22       THE COURT:  Are you now or have you recently been

23 under the care of a physician or a psychiatrist?

24       THE DEFENDANT:  No, Your Honor.

25       THE COURT:  Are you now or have you recently been

1  hospitalized or treated for narcotic addiction?

2          THE DEFENDANT:  No, Your Honor, no.

3          THE COURT:  Do you understand what is happening

4  here today?  Previously, you pled not guilty to Count 1 of

5  the indictment.  You are here today to change that to a

6  guilty plea.  Do you understand that?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Does either counsel have doubt about

9  the competence of Mr. Prihar to plead guilty at this time to

10  Count 1 of the indictment?  Mr. Comber, do you?

11          MR. COMBER:  No, Your Honor.

12          THE COURT:  Ms. Smolar?

13          MS. SMOLAR:  No, Your Honor.

14          THE COURT:  I then find that Mr. Prihar is

15  competent to enter a guilty plea.  What is your attorney's

16  name, Mr. Prihar?

17          THE DEFENDANT:  Mike Comber, Your Honor.

18          THE COURT:  Have you had sufficient opportunity to

19  discuss your case with him?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Are you satisfied with the work that

22  he has done for you up to this point?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Do you understand that if you continue

25  to plead not guilty, if you did not change your plea today,

1  you would have the right to be assisted by an attorney at

2  all stages of the proceedings against you, including the

3  trial?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Do you understand that if you did not

6  enter a guilty plea and if you qualified financially, you

7  would be entitled to be assisted by an attorney at no cost

8  to you at all stages of the proceedings against you?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Do you understand that if you did not

11  plead guilty and if you chose to go to trial, under the

12  constitution and laws of the United States, you would be

13  entitled to a speedy trial by a judge and a jury on the

14  charges set forth in the indictment?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  Do you understand that if you went to

17  trial, you would be presumed to be innocent at trial of the

18  charges filed against you?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  Do you understand that if you went to

21  trial, the government would be required to prove your guilt

22  by competent evidence beyond a reasonable doubt before you

23  could be found guilty?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Do you understand that if you went to

1  trial, you would not have to prove that you were innocent?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Do you understand that if you went to

4  trial, a jury would have to be unanimous in order to find

5  you guilty of the charge filed against you?  In other words,

6  each and every juror would have to agree that you were

7  guilty before you could be found guilty.

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Do you understand that if you went to

10  trial, you would have the right to participate in the

11  selection of the jury?  And what that means is this:  A

12  group of individuals would be brought into the courtroom.

13  That is a jury panel.  You would have the right to remove

14  from that panel any individual who demonstrated that he or

15  she was not able to reach a fair and impartial verdict.

16          In addition, you would have the right to remove ten

17  prospective jurors and one prospective alternate juror from

18  the jury panel without giving any reason at all for doing

19  so.

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Do you understand that if you went to

22  trial, witnesses for the government would have to come into

23  the courtroom and testify in your presence?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Do you understand that if you went to

1    trial, your attorney could cross-examine the government's

2    witnesses, object to evidence offered by the government, and

3    offer evidence on your behalf?

4            THE DEFENDANT:  Yes, Your Honor.

5            THE COURT:  Do you understand that if you went to

6    trial, the government would have to pay witness fees to

7    witnesses you wish to call on your behalf if you qualify as

8    being financially unable to pay such witness fees?

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  Do you understand that if you went to

11   trial, you would have the right to testify if you chose to

12   testify?

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  Do you understand that if you went to

15   trial, you would have the right not to testify, and, if you

16   chose not to testify, no one could infer or suggest that you

17   were guilty because you did not testify?

18           THE DEFENDANT:  Yes, Your Honor.

19           THE COURT:  If you plead guilty and I accept your

20   plea, do you understand you will give up your right to a

21   trial and all the other rights that I have mentioned to you,

22   that there will be no trial, and that I will enter a

23   judgment of guilty and sentence you on the basis of your

24   guilty plea after considering a presentence report?

25           THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  If you plead guilty, do you understand

2     that you will also have to give up your right not to

3     incriminate yourself, because I will question you about what

4     you did in order to satisfy myself that you are guilty as

5     charged, and you will have to admit that you are guilty as

6     charged?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Now that I have mentioned these rights

9     to you, do you still want to plead guilty?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  Have you received a copy of the

12    indictment naming you and discussed with your attorney the

13    charge to which you intend to plead guilty?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  Do you understand that you are charged

16    in the indictment as follows:  The indictment charges that

17    at all times material to the indictment, you are an Israeli

18    citizen residing in Brazil and that Michael Phan was an

19    Israeli citizen residing in Israel, and that from in and

20    around October 2013 and continuing through the date of the

21    indictment, you and Mr. Phan owned and operated a Web site

22    known as DeepDotWeb, which I will refer to as "DDW."

23         DDW provided users with direct access to numerous

24    online darknet marketplaces not accessible through

25    traditional search engines, at which vendors offered for

1  sale illegal narcotics such as fentanyl, carfentanil,

2  cocaine, heroin, and crystal methamphetamine, firearms,

3  including assault rifles, malicious software and hacking

4  tools, stolen financial information, and payment cards and

5  numbers, access-device-making equipment, and other illegal

6  contraband.

7        You and Phan received kick-back payments

8  representing a part of the proceeds from each purchase of

9  those illegal goods made by individuals referred to a

10  darknet marketplace from the DDW site.  These kick-back

11  payments were made in virtual currency, such as Bitcoin, and

12  paid into a DDW-controlled Bitcoin wallet.

13        To conceal and disguise the nature and source of

14  the illegal proceeds totaling over $15 million, you and Phan

15  transferred your illegal kick-back payments from the DDW

16  Bitcoin wallet to other Bitcoin accounts and to bank

17  accounts you controlled in the names of shell companies.

18        To maximize purchases made on the darknet

19  marketplaces and your kick-backs from those purchases, DDW

20  featured tutorials on how to buy drugs online through

21  darknet marketplaces and offered comparisons and reviews of

22  various other marketplaces.

23        DDW warned users of worldwide law enforcement

24  actions associated with criminal activity on the darknet.

25  Beginning in and around October 2013 and continuing through

1  the date of the indictment in the Western District of
2  Pennsylvania and elsewhere, you and Phan did knowingly,
3  intentionally, and unlawfully conspire together with each
4  other, with darknet marketplace administrators, and with
5  other persons to commit certain offenses against the United
6  States, that is to knowingly conduct and attempt to conduct
7  financial transactions affecting interstate and foreign
8  commerce, which transactions involved the proceeds of
9  specified unlawful activity with the intent to promote the
10 specified unlawful activity and knowing that the property
11 involved in the transactions represented the proceeds of
12 some form of unlawful activity and knowing that the
13 transactions were designed in whole or in part to conceal
14 and disguise the nature, the location, the source, the
15 ownership, and the control of the proceeds as specified
16 unlawful activity all in violation of federal law.
17          The indictment further alleges that the specified
18 unlawful activity included the felonious manufacture,
19 importation, receiving, concealment, buying, selling, and
20 otherwise dealing in a controlled substance in violation of
21 federal law, fraud and related activity in connection with
22 identification documents in violation of federal law, fraud
23 and related activity in connection with access devices in
24 violation of federal law, and fraud and related activity in
25 connection with computers in violation of federal law.

1        The indictment further alleges the manner and means

2   of the conspiracy.  During all times relevant to the

3   indictment, darknet marketplaces operated on a Tor, T-O-R,

4   network, a computer network designed to facilitate anonymous

5   communication over the Internet.

6        Because of Tor's structure, a user who wanted to

7   visit a particular darknet marketplace had to know the

8   site's exact onion address.  DDW simplified this process by

9   including pages and hyperlinks to various darknet

10  marketplaces' onion addresses.

11       Users who visited DDW were able to click on the

12  hyperlinks to navigate directly to the darknet marketplaces.

13  Embedded in these links were unique account identifiers

14  which enabled the individual marketplaces to pay what they

15  referred to as "referral bonuses" to DDW.  Referral bonuses

16  paid in virtual currency for a percentage of the profits of

17  all the activities conducted on the marketplace -- I'm

18  sorry.  My computer just fizzled -- for a percentage of the

19  profits of all the activities conducted on the marketplace

20  by any user who made purchases on the marketplace by using

21  DDW's customized referral link.

22       Through the use of the referral links, DDW received

23  kick-backs from darknet marketplaces every time a purchaser

24  used DDW to buy illegal narcotics or other illegal goods on

25  the marketplace.

1          During the time period relevant to the indictment,

2    DDW's referral links were widely used by users in the

3    Western District of Pennsylvania and elsewhere to access and

4    create accounts on many darknet marketplaces.

5          Over the course of the conspiracy, you and Mr. Phan

6    referred hundreds of thousands of users to darknet

7    marketplaces.  These users, in turn, completed hundreds of

8    millions of dollars worth of transactions, including

9    purchases of illegal narcotics such as fentanyl,

10   carfentanil, cocaine, heroin, and crystal methamphetamine,

11   firearms, including assault riffles, malicious software and

12   hacking tools, stolen financial information and payment

13   cards and numbers, access-device-making equipment, and other

14   illegal contraband.

15         Through the use of referral links, you reaped

16   commissions worth millions of dollars, you and your

17   co-defendant, generated from the elicit sales conducted on

18   darknet marketplace accounts created through the site.

19         You and your co-defendant grew and promoted the DDW

20   site, which functioned to drive further traffic to the DDW

21   referral links, generating additional income for you and

22   Mr. Phan.  You functioned as the administrator of DDW.  You

23   registered the domain, made infrastructure payments, and

24   maintained control over site contact.

25         Phan was responsible for DDW's technical

operations, designing and maintaining the Web site's day-to-day operation.  You and Phan communicated on a daily basis to facilitate your criminal enterprise.

From in or before November 2014 until the date of the indictment, you and Phan controlled a Bitcoin wallet that you used to receive kick-back payments for purchases completed on the various darknet marketplaces.

Throughout the course of the conspiracy, DDW operated accounts on darknet markets and communicated with the operators of various darknet markets regarding kick-back payments.

At various times relevant to this indictment, DDW posted referral links to numerous darknet marketplaces, including AlphaBay Market, Agora Market, Abraxas Market, Dream Market, Valhalla Market, Hansa Market, TradeRoute Market, Dr. D's, Wall Street Market, and Tochka Market.

One second here.  During the time period relevant to the indictment, users located in the Western District of Pennsylvania and elsewhere could and did click on the DDW referral links for the markets I have mentioned and created accounts with each of those marketplaces.

DDW users used these accounts to purchase illegal narcotics that I have mentioned earlier and firearms that I had mentioned earlier, proxy service and virtual private network services, fake and stolen identification documents,

such as driver's licenses and passports, and stolen access
devices, including credit card numbers and hacked accounts
from numerous providers, including United States-based
financial institutions, Internet service providers,
ride-sharing services, and video streaming services.

As the owner and operator of DDW, you earned a
kick-back for every illegal purchase conducted by accounts
created by way of the DDW marketplace referral link.
Between in and around November 2014 and April 10, 2019, DDW
received approximately 8,155 Bitcoin in kick-back payments
from darknet marketplaces worth approximately $8,414,173
when adjusted for the trading value of Bitcoin at the time
of the transaction.

The Bitcoin was transferred to your Bitcoin wallet,
which you controlled, in a series of more than 40,000
deposits and was subsequently withdrawn to various
destinations through over 2,700 transactions.  Due to
Bitcoin's fluctuating exchange rate, the value of the
Bitcoin at the time of the withdrawals from the DDW Bitcoin
wallet equates to approximately $15,489,415.

Between in and around December 2016 and on or about
July 4, 2017, approximately four dozen individuals in the
Western District of Pennsylvania used a DDW referral link to
create accounts on AlphaBay market.  These users purchased
thousands of dollars of illegal markets, including crack

cocaine and crystal methamphetamine, oxycodone, and LSD, as
well as a fake custom passport, which they had shipped to
the Western District of Pennsylvania.  DDW received a
kick-back from each purchase made.

Between in and around January of 2016 and on or
about July 18, 2017, approximately 65 individuals in the
Western District of Pennsylvania used a DDW referral link to
create accounts on Hansa Market.  These users purchased
illegal narcotics, including cocaine and methamphetamine,
oxycodone, and LSD, and fake payroll checks, which they had
shipped to the Western District of Pennsylvania, as well as
proxy servers.  You received a kick-back from each of these
purchases made.

On September 20, 2017, an FBI undercover employee
in the Western District of Pennsylvania purchased six grams
of crystal methamphetamine from a vendor operating on
Tochka Market.  A commission from that illegal drug
transaction was transferred to your Bitcoin wallet.

On April 12, 2019, an FBI undercover employee in
the Western District of Pennsylvania visited the DDW Web
site and created an account on Tochka Market using the DDW
referral link.  Using the DDW linked account, the FBI
undercover employee purchased 10 grams of crystal
methamphetamine at a cost $470.

On April 16 of 2019, an FBI undercover employee in

the Western District of Pennsylvania visited the DDW Web
site and created an account on Tochka Market using the DDW
referral link.  Using this linked account, the FBI
undercover employee purchased 10 grams of crystal
methamphetamine for $407.72, 60 OxyContin 60-milligram
tablets at a cost of $431.66, and Tricera ransomware, a
software that encrypts victim's computers and renders them
useless until a ransom is paid at a cost of $82.38.

On April 16, 2019, an FBI undercover employee in
the Western District of Pennsylvania visited the DDW Web
site and created an account on Wall Street Market using the
DDW referral link.  Using that account, the FBI undercover
employee purchased 3.5 grams of heroin that cost $82.38,
2 compromised credit cards at a cost of $37.80, and 10 grams
of cocaine at a cost of $480.

In seeking to conceal your elicit activities and
protect your criminal enterprise and illegal proceeds it
generated, you and your co-defendant set up numerous shell
companies around the world and used these companies to move
your ill-gotten gains and conduct other activity related
to DDW.

These companies included WwwCom Limited,
M&T Marketing, Imtech, O.T.S.R Biztech, and Tal Advanced
Tech.  Throughout the course of the conspiracy, you held
numerous accounts at the virtual currency exchanges and

1  related companies to which you routed your ill-gotten gains.
2  These accounts were held in the names of Prihar, Phan, M&T
3  Marketing Limited, WwwCom Limited, and WwCom Limited.
4          You and your co-defendant subsequently moved
5  funds -- is that the noise from the jail?
6          THE DEFENDANT:  Yeah, from behind me.
7          THE COURT:  Okay.  Can everyone hear me?  That's
8  what I want to know.
9          THE DEFENDANT:  I can hear you.
10          THE COURT REPORTER:  I'm having trouble hearing
11  some parts with the background noise.
12          THE COURT:  The background.  Okay.  Well, I'm not
13  sure what we can do about it.  It seems to be quiet right
14  now.
15          You and your co-defendant subsequently moved funds
16  into multiple bank accounts, which you controlled, including
17  accounts at Baltikums Bank in Latvia, First International
18  Bank of Israel in Israel, and TBC Bank in Georgia, all in
19  violation of federal law.
20          And there are forfeiture allegations, as well, in
21  the complaint, which we will review, I think, at some point.
22  But the virtual, of course, is for your virtual -- the
23  forfeiture is for virtual currency accounts, bank accounts,
24  domain and contents, laptops, iPhone, and you remember
25  seeing the forfeiture allegations in the indictment,

1  Mr. Prihar?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Okay.  Do you understand the charges

4  that have been filed against you?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Okay.  What I'm going to do now is the

7  following:  I am going to tell you specifically what it is

8  that the government would have to prove at trial with

9  respect to this charge.

10          In order for the crime of conspiracy to commit

11  money laundering in violation of federal law to be

12  established, the government must prove all three of the

13  following essential elements beyond a reasonable doubt:

14  That a conspiracy to launder money, as charged in the

15  indictment, was entered into by two or more people; two,

16  that you knew the purpose of the conspiracy; and, three,

17  that you deliberately joined the conspiracy.

18          Do you understand what the government would have to

19  prove at trial?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  I want to review with you now the

22  maximum penalty that could be imposed if you were convicted

23  of this offense after trial:  A term of imprisonment of not

24  more than 20 years, a fine of not more than $500, or twice

25  the value of the property involved in the transaction,

1  whichever is greater.  And finally, if your sentence

2  includes a term of imprisonment, then a period of supervised

3  release of not more than three years.

4          In addition, do you understand that you will be

5  assessed a mandatory special assessment of $100 pursuant to

6  federal law for the Crime Victims Fund?  Do you understand

7  the maximum penalty?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Also, as I stated earlier, restitution

10 may be required and forfeiture as set forth in the

11 indictment will be applicable in this case.  Do you

12 understand that?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Has anyone made any threat to you or

15 anyone else that has forced you in any way to plead guilty?

16         THE DEFENDANT:  No, Your Honor.

17         THE COURT:  Now, I do know that there is a plea

18 agreement in this case, and I'm going to ask you,

19 Mr. Prihar, if you have read the entire plea agreement and

20 reviewed it with your attorney?

21         THE DEFENDANT:  Yes, I've read it, Your Honor.

22         THE COURT:  Okay.  I'm going to ask Ms. Smolar to

23 put the substance of the plea agreement on the record and

24 for you to listen carefully.

25         MS. SMOLAR:  Your Honor, just one correction.

1   When you read the penalties, I believe it's a fine of not

2   more than $500,000, as opposed to $500.

3            THE COURT:  I'm sorry.  I did make a mistake.  I'm

4   sorry.  All this talking.  Mr. Prihar, do you understand

5   that the maximum penalty can be $500,000?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  Not $500, $500,000.  Thank you,

8   Ms. Smolar.

9            MS. SMOLAR:  Sure.  Yes, Your Honor, there is a

10  plea agreement dated March 15, 2021.  Pursuant to the plea

11  agreement, the defendant, Tal Prihar, agrees to enter a plea

12  of guilty to Count 1 of the indictment, charging him with

13  violating Title 18 United States Code, Section 1956(h).

14           He agrees to pay any mandatory restitution.  He

15  agrees that the restitution and any other financial

16  obligations imposed by the court are due and payable

17  immediately after judgment is entered subject to immediate

18  enforcement in full by the United States.

19           Upon request of the United States, the defendant

20  agrees to provide all information regarding his income,

21  assets, and financial status, and that of his household.  If

22  requested, he agrees to submit to an interview and/or

23  deposition as to these matters and to undergo a polygraph

24  examination.

25           Upon request, he also agrees to complete a sworn

1   financial statement and to provide all documents under the

2   defendant's possession or control regarding his financial

3   resources.  The defendant authorizes the United States to

4   obtain a credit report pertaining to him.

5          He will immediately notify the court and the United

6   States Attorney of any improvements in his economic

7   circumstances that might increase his ability to pay

8   restitution.

9          He will voluntarily forfeit to the United States

10  all property subject to forfeiture, including, but not

11  limited to, the following:  The virtual currency accounts at

12  Okcoin, corporate account in the name of WwwCom Limited,

13  virtual currency account at Kraken, which is an individual

14  account in the name of Tal Prihar, virtual currency account

15  at Binance under the control of Tal Prihar, and all virtual

16  currency, including private keys, recovery seeds, and

17  passwords, under the control of Tal Prihar.

18         With regard to bank accounts, he agrees to forfeit

19  to the United States the bank accounts listed on Page 3 at

20  the TBC Bank in Georgia, all in the name of Tal Prihar.  And

21  then the other categories of forfeiture are the DeepDotWeb

22  domain and the contents of the DeepDotWeb server or site,

23  one Asus Model X510U laptop, and one black in color Apple

24  iPhone in a black case with charger.

25         And he acknowledges that the above-described

property is presently the subject of a criminal forfeiture
action and that the property is properly forfeitable to the
United States as property involved in the offense.

The United States and the defendant agree that all
of the computers, computer media, computer peripherals
seized from the defendant current -- and the current in the
custody or control of the government were properly seized
and involved in or used in violation of federal law by the
defendant.

Tal Prihar agrees to the entry of a forfeiture
money judgment in favor of the United States in the amount
of $8,414,173 pursuant to 18 United States Code, Section
982(a)(1).  Any funds seized as a result of the forfeiture
of virtual currency accounts and bank accounts referenced in
Paragraph 6 will count towards the satisfaction of this
money judgment.

He agrees that the United States is not limited to
forfeiture of the property described above.  If the United
States determines that property of the defendant identified
for forfeiture cannot be located upon the exercise of due
diligence, has been transferred or sold to or deposited with
a third party, has been placed beyond the jurisdiction of
the court, has substantially diminished in value, or has
been commingled with other property which cannot be divided
without difficulty, then the United States shall, at its

option, be entitled to forfeiture of any other property,
substitute assets, of the defendant up to the value of the
property described above.  The court shall retain
jurisdiction to settle any disputes arising from application
of this clause.

The defendant agrees that forfeiture of substitute
assets, as authorized herein, shall not be deemed to be an
alternation of the defendant's sentence.  Forfeiture of the
defendant's assets shall not be treated as satisfaction of
any fine, restitution, cost of imprisonment, or any other
penalty the court may impose upon the defendant in addition
to the forfeiture.

He will pay a special assessment of $100 to the
Clerk of Court.  He recognizes that pleading guilty may have
consequences with respect to his immigration status if he is
not a citizen of the United States.  Under federal law, a
broad range of crimes are removable offenses.  Removal and
other immigration consequences, including denaturalization
if the defendant is a naturalized citizen, are the subject
of a separate proceeding.

However, the defendant understands that no one,
including his attorney or the district court, can predict to
a certainty the effect of his conviction on his immigration
status.  The defendant, nevertheless, affirms that he wants
to plead guilty regardless of any immigration consequences

that his plea may entail even if the consequence is his automatic removal from the United States.

If the defendant abides by all the conditions of this agreement and is eligible and applies to transfer his sentence pursuant to the International Prisoner Transfer Program, the United States Attorney's office for the Western District of Pennsylvania agrees to not oppose the defendant's transfer application.

Defendant acknowledges and understands, however, that the transfer decision rests in the sole discretion of the Office of International Affairs, OIA, of the criminal division of the United States Department of Justice and that the position of the United States Attorney's Office for the Western District of Pennsylvania is neither binding, nor determinative of the position of other federal agencies or on the final transfer decision of OIA.

Defendant further understands that in addition to OIA, federal law and the underlying transfer treaties require that the foreign government must also approve the transfer.

The defendant agrees not to make a request under the International Prisoner Transfer Program until the conditions set forth in this agreement are met or no sooner than one year from the date of his guilty plea, whichever comes first.

1   The defendant understands and acknowledges that the
2   International Prisoner Transfer Program is designed to
3   relieve some of the special hardships that fall upon
4   offenders incarcerated in a foreign country and to
5   facilitate the rehabilitation of these offenders.  The
6   defendant understands and acknowledges, however, that this
7   office has no authority to grant or deny the defendant's
8   request under the program.

9   Tal Prihar waives the right to take a direct appeal
10  from his conviction or sentence subject to the following
11  exceptions:  If the United States appeals from the sentence,
12  the defendant may take a direct appeal from the sentence.
13  If the sentence exceeds the applicable statutory limits set
14  forth in the United States Code or the sentence unreasonably
15  exceeds the guideline range determined by the court,
16  Tal Prihar may take a direct appeal from the sentence.

17  The defendant further waives the right to file a
18  motion to vacate sentence under 20 United States Code
19  Section 2255, attacking his conviction or sentence, and the
20  right to file any other collateral proceedings attacking his
21  conviction or sentence.

22  Nothing in the forgoing waivers of rights shall
23  preclude the defendant from raising a claim of ineffective
24  assistance of counsel in an appropriate forum if otherwise
25  permitted by law.  The defendant understands that the

1   government retains its right to oppose any such claim on

2   procedural or substantive grounds.

3          In consideration and entirely contingent upon the

4   prior provisions of this agreement, the United States

5   Attorney for the Western District of Pennsylvania agrees to

6   the following:  The United States Attorney retains the right

7   of allocution at the time of sentencing to advise the

8   sentencing court of the full nature and extent of the

9   involvement of Tal Prihar in the offense charged in the

10  indictment and any other matters relevant to the imposition

11  of a fair and just sentence.

12         The United States agrees to recommend a two-level

13  downward adjustment for acceptance of responsibility and

14  pursuant to Sentencing Guideline 3E1.1B to move for an

15  additional one-level adjustment.

16         However, if at any time prior to imposition of the

17  sentence, the defendant fails to fully satisfy the criteria

18  set forth in Section 3E1.1 or acts in a manner inconsistent

19  with acceptance of responsibility, the United States will

20  not make, or if already made, will withdraw this

21  recommendation or motion.  The United States Attorney will

22  take any position he deems appropriate in the course of any

23  appeals from the sentence or in response to any

24  post-sentence motions.

25         The Court has already discussed the penalties which

1   are set forth on Page 6 of the agreement, but I will not go

2   through these again at this time.  Parties stipulate that

3   under Sentencing Guideline 2S1.1A2, the base offense level

4   is 8.  The base offense level is increased by 18 levels

5   under 2B1.1B1J because the value of the laundered funds is

6   more than $3,500,000.

7        The offense level is increased by six levels under

8   Sentencing Guideline Section 2S1.1B1 because the defendant

9   knew or believed that any of the laundered funds were the

10  proceeds of an offense involving the manufacture,

11  importation, or distribution of a controlled substance or a

12  listed chemical.

13       The offense level is further increased by two

14  levels under Section 2S1.1B2B because the defendant was

15  convicted under Title 18 United States Code, Section 1956.

16  The offense level is further increased by two levels under

17  2S1.1B3 because the offense involves sophisticated

18  laundering.

19       Following a three-level reduction for timely

20  acceptance of responsibility, the parties stipulate that the

21  final offense level is 33.  This stipulation represents the

22  parties' best understanding on the basis of the information

23  available as of the date of this agreement.  The stipulation

24  is not binding on the court and does not preclude the

25  parties from bringing to the attention of the probation

1 office or the court any information not within their

2 knowledge.  The United States agrees to recommend a sentence

3 at the low end of the guideline range as calculated and

4 adopted by the court.

5          THE COURT:  Thank you.  As we do in every

6 sentencing proceeding, we will now have a sidebar.  So other

7 people, Susan, you'll put them in the waiting room.

8          THE DEPUTY CLERK:  Yes.  One moment.

9      (Sealed sidebar discussion.)

10          THE COURT:  Do we have everyone back, Susan?

11 You're muted.

12          THE DEPUTY CLERK:  Sorry, Judge.  Yes.  Everyone

13 seems to be back.

14          THE COURT:  Okay.  Thank you.  Mr. Prihar, you

15 heard what the Assistant United States Attorney and your

16 attorney just said to describe the agreement you arrived at

17 with the government, did you not?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  Did you understand what they said?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  And do you agree that what they said

22 accurately describes the terms of the agreement?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  You should understand that I am not

25 required to accept a plea agreement.  I may reject it.  In

1  the unlikely event that I did reject the plea agreement, you

2  would be advised of that in open court and have the

3  opportunity to withdraw your guilty plea.

4        If I rejected the plea agreement and you decided to

5  continue with your plea of guilty, the disposition of your

6  case could be less favorable than that called for by the

7  plea agreement.  Do you understand that?

8        THE DEFENDANT:  Yes, Your Honor.

9        THE COURT:  Do you understand that the offense to

10  which you are pleading guilty is a felony?  If your plea is

11  accepted, you would be adjudged guilty of a felony.  And I

12  am not sure.  I'm assuming that you are not a United States

13  citizen.  Is that correct?

14        THE DEFENDANT:  Correct, Your Honor.

15        THE COURT:  And do you understand that there may

16  be consequences to your guilty plea?  I know that was stated

17  out loud by Ms. Smolar, but I want to be sure that you

18  understand that there could be consequences to your

19  immigration status if you are not a United States citizen.

20  Do you understand that?

21        THE DEFENDANT:  Yes, Your Honor.

22        THE COURT:  That you may be deported and that

23  there are no guarantees as to what effect this will have on

24  your immigration status.

25        THE DEFENDANT:  Yes, Your Honor, I understand.

1          THE COURT:  And at least in the United States,

2     this will affect the right to possess any kind of firearm.

3     Do you understand that?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Under the Sentencing Reform Act of

6     1984, the United States Sentencing Commission issued

7     guidelines for judges to follow in determining sentences in

8     criminal cases for offenses occurring after November 1,

9     1987.

10          The United States Supreme Court has ruled that

11     these guidelines are advisory only.  Have you and your

12     attorney talked about how the advisory sentencing guidelines

13     might apply to your case?

14          THE DEFENDANT:  Yes, Your Honor, we discussed it.

15          THE COURT:  Do you understand that I will not be

16     able to determine the advisory guideline sentence range for

17     your case until after a presentence report has been

18     completed and you and the government have had the

19     opportunity to review the report and perhaps challenge any

20     of the facts or calculations in it?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Do you understand that after it has

23     been determined what advisory guideline sentence range

24     applies to a case, I have the authority to impose a sentence

25     either more severe or less severe than that called for by

1    the advisory sentencing guidelines?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  And do you understand that under

4    certain circumstances, you or the government may have the

5    right to appeal any sentence that I oppose?  However, by the

6    terms of the plea agreement that you have entered into with

7    the government, you have given up the right to take a direct

8    appeal from your conviction or sentence subject to three

9    exceptions, all of which are very narrow.

10             If your sentence would exceed the applicable

11   statutory limits set forth in federal law, then you could

12   take an appeal.  And I can assure you, that is not going to

13   happen.  If your sentence unreasonably exceeds the advisory

14   guideline range that I determine applies to this case, then

15   you could take a direct appeal from your sentence.  And the

16   likelihood of that happening is very small.

17             Finally, if the United States appeals from the

18   sentence, then you may take a direct appeal from the

19   sentence.  Do you understand that your right to take a

20   direct appeal from your conviction or sentence is limited to

21   these three exceptions?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  And you understand how narrow the

24   exceptions are?

25             THE DEFENDANT:  Yes, Your Honor.

1      THE COURT:  You have also given up the right to

2 file a motion to vacate your sentence under 28 United States

3 Code 2255 attacking your conviction or sentence and the

4 right to file any other collateral proceeding attacking your

5 conviction or sentence.  Do you understand that?

6      THE DEFENDANT:  Yes, Your Honor.

7      THE COURT:  However, nothing in this giving up of

8 rights would preclude you from raising a claim of

9 ineffective assistance of counsel in an appropriate forum if

10 otherwise permitted by law.  Do you understand that?

11      THE DEFENDANT:  Yes, Your Honor.

12      THE COURT:  And do you understand that parole has

13 been abolished, and if you are sentenced to a term of

14 imprisonment, you will not be released on parole?

15      THE DEFENDANT:  Yes, Your Honor.

16      THE COURT:  Do you understand that if your

17 sentence is more severe than you expected, you will still be

18 bound by your guilty plea and have no right to withdraw it?

19      THE DEFENDANT:  Yes, Your Honor.

20      THE COURT:  Except for your discussions with your

21 attorney about the advisory sentencing guidelines, has

22 anyone made any prediction or promise to you about what your

23 sentence will be?

24      THE DEFENDANT:  No, Your Honor.

25      THE COURT:  Has anything I have said here today

1   suggested to you what your actual sentence will be?

2          THE DEFENDANT:  No, Your Honor.

3          THE COURT:  Have you been instructed by anyone to

4   respond untruthfully to any question about a promised

5   sentence?

6          THE DEFENDANT:  No, Your Honor.

7          THE COURT:  Mr. Prihar, did you, beginning in and

8   around October 2013 and continuing through the date of this

9   indictment, in the Western District of Pennsylvania and

10  elsewhere, along with Mr. Phan, knowingly, intentionally,

11  and unlawfully conspire together with him and other darknet

12  marketplace administrators and with other persons to commit

13  certain offenses against the United States, that is to

14  knowingly conduct and attempt to conduct financial

15  transactions affecting interstate and foreign commerce,

16  which transactions involved the proceeds of specified

17  unlawful activity with the intent to promote the carrying on

18  of specified unlawful activity in violation of federal law,

19  knowing that the property involved in the transactions

20  represented the proceeds of some form of unlawful activity

21  and knowing that the transactions were designed in whole and

22  in part to conceal and disguise the nature of the location,

23  the source, the ownership, and the control of the proceeds

24  of specified unlawful activity, all in violation of federal

25  law?  Did you do that, sir?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Ms. Smolar, would you summarize the

3    government's evidence about this charge?  And I want you to

4    listen carefully as she does so, Mr. Prihar.

5          THE DEFENDANT:  Okay.

6          MS. SMOLAR:  Yes, Your Honor.  Beginning in

7    October of 2013 and continuing until its seizure in April of

8    2019, Tal Prihar and Michael Phan, both Israeli citizens,

9    owned and operated DeepDotWeb, which I'll refer to as "DDW."

10   Prihar and Phan grew up in Israel, but Prihar moved to

11   Brazil, and Phan resides in Israel.

12          The DeepDotWeb site included content pertaining to

13   darknet marketplaces, including how to remain anonymous

14   online, virtual currency, and worldwide law enforcement

15   actions associated with criminal activity on the darknet.

16          DDW also featured tutorials on how to buy drugs

17   online through darknet marketplaces and offered comparisons

18   and reviews of various marketplaces selling illegal

19   narcotics.

20          The DDW site also included hyperlinks to various

21   darknet marketplaces dot-web addresses.  Users who visited

22   DDW were able to click on the hyperlinks to directly

23   navigate to the darknet marketplaces.

24          Embedded in these links were unique account

25   identifiers, which enabled the individual marketplaces to

1  pay "referral bonuses," also known as "affiliate bonuses" to
2  DDW, referral bonuses paid in virtual currency for a
3  percentage of the profits from all the transactions on the
4  marketplace by any user who accessed the site through DDW's
5  customized referral link.  Through the referral links, DDW
6  received kick-backs from darknet marketplaces for directing
7  DDW users to the marketplaces.
8        During the time period relevant to our indictment,
9  DDW's referral links were widely used by individuals in the
10 Western District of Pennsylvania and elsewhere to access
11 many darknet marketplaces.
12       In fact, over the course of the conspiracy, the
13 defendants referred hundreds of thousands of users to
14 darknet marketplaces.  These users, in turn, completed
15 hundreds of millions of dollars worth of transactions,
16 including purchases of illegal narcotics, such as fentanyl,
17 carfentanil, cocaine, heroin, and crystal methamphetamine,
18 firearms, including assault rifles, malicious software and
19 hacking tools, stolen financial information, and payment
20 cards and numbers, access-device-making equipment and other
21 illegal contraband.
22       Through the use of the referral links, the
23 defendants reaped commissions worth millions of dollars
24 generated from the elicit sales conducted on darknet market
25 accounts created through the site.  The defendants grew and

promoted the DDW site, which functioned to drive further

traffic to the DDW referral links, generating additional

income for the defendants.

Prihar operated as the administrator of DDW.  He

registered the domain, made infrastructure payments, and

maintained control over site content.  Phan was responsible

for DDW's technical operations, designing and maintaining

the Web site's day-to-day operations.  Phan and Prihar

communicated on a daily basis to facilitate their criminal

enterprise.

From on or before November 2014 until the site was

seized in April of 2019, the defendants controlled a Bitcoin

wallet where the defendants received a commission of sales

completed on various darknet marketplaces.  Throughout the

course of the conspiracy, DDW operated accounts on darknet

markets and communicated with the operators of various

darknet markets regarding the kick-back payments.

DDW posted referral links to the following darknet

marketplaces:  AlphaBay Market, Agora Market, Abraxas

Market, Dream Market, Valhalla Market, Hansa Market,

TradeRoute Market, Dr. D's, Wall Street Market, and Tochka

Market.

23.6 percent of all orders completed on AlphaBay

and 47.2 percent of orders completed on Hansa were from

users referred by DDW.  DDW received a kick-back on all of

1  those users' purchases.

2          The nexus to the Western District of Pennsylvania

3  is strong.  For example, between December 5, 2016 and

4  July 4, 2017, approximately four dozen individuals in the

5  Western District of Pennsylvania used a DDW referral link to

6  create accounts on AlphaBay Market.  These users purchased

7  thousands of illegal narcotics, including crack cocaine and

8  crystal methamphetamine, oxycodone and LSD, as well as fake

9  custom passports, which they had shipped to the Western

10  District of Pennsylvania.

11          Further, undercover illegal narcotics purchases

12  have been made by FBI undercover employees using the

13  referral links on DDW.  Those illegal narcotics were then

14  shipped to the Western District of Pennsylvania.

15          Between November 2014 and April 10 of 2019, DDW

16  received approximately 8,155 Bitcoin in kick-back payments

17  from darknet marketplaces worth approximately $8,414,173

18  when adjusted for the trading value of Bitcoin at the time

19  of each transaction.  The Bitcoin was transferred to DDW's

20  Bitcoin wallet in a series of more than 40,000 deposits and

21  was subsequently withdrawn to various locations.

22          In seeking to protect their criminal enterprise and

23  the illegal proceeds it generated, the defendants set up

24  shell companies around the world.  The defendants used these

25  companies to move and conceal their ill-gotten gains and

```
 1  conduct other activity related to DDW.  They subsequently

 2  moved funds into multiple bank accounts, including accounts

 3  at Baltikums Bank in Latvia and TBC Bank in Georgia.

 4            THE COURT:  Okay.  Mr. Prihar, did you hear what

 5  Ms. Smolar stated that the government contends that you did?

 6            THE DEFENDANT:  Yes, Your Honor.

 7            THE COURT:  Did you understand what she said?

 8            THE DEFENDANT:  Yes, Your Honor.

 9            THE COURT:  Do you agree that what she said

10  accurately describes what you did?

11            THE DEFENDANT:  Yes, Your Honor.

12            THE COURT:  Do you still want to plead guilty?

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  Mr. Comber, is it your advice that

15  Mr. Prihar plead guilty?

16            MR. COMBER:  It is, Your Honor.

17            THE COURT:  Mr. Prihar, because you acknowledge

18  that you are, in fact, guilty as charged in the indictment,

19  because you know about the right to a trial, because you

20  know the maximum penalty that could be imposed if you were

21  convicted of this offense after trial, and because you are

22  voluntarily pleading guilty, I will accept your guilty plea

23  and enter a judgment of guilty on your plea to Count 1 of

24  Indictment No. 19-115.

25            It is the finding of the Court in the case of the
```

1  United States of America against Tal Prihar that Mr. Prihar

2  is fully competent and capable of entering an informed plea,

3  that his plea of guilty is knowing and voluntary and

4  supported by an independent basis, in fact, committing each

5  of the essential elements of the offense.

6          Therefore, the plea is accepted, and the defendant,

7  Tal Prihar, is now adjudged guilty of the charge contained

8  in Count 1.  And we already have a signed change of plea.

9  So that is already in our possession.  Is that right, Susan?

10          THE DEPUTY CLERK:  That's correct, Judge.

11          THE COURT:  Okay.  So the next thing that happens,

12  Mr. Prihar, is that a presentence investigation report will

13  be prepared by the United States Probation Office.  And this

14  is pursuant to our local criminal rule, 32(c).  After the

15  report is completed, the probation office will send a copy

16  of that report to your attorney to review with you before

17  you are sentenced.  A copy will also be sent to the

18  Assistant United States Attorney.

19          If either the government or you disputes facts

20  contained in the report that are material to sentencing,

21  then you or the government are obliged to seek

22  administrative resolution of those matters in a presentence

23  conference with opposing counsel and the probation office.

24          Thereafter, both your attorney and the Assistant

25  United States Attorney will file a position with respect to

sentencing factors, accompanied by a written statement

certifying that counsel has conferred with opposing counsel

and the probation office in an attempt to resolve any

disputes.  After receipt of those positions, the probation

officer will make any necessary investigation and changes to

the report.

        Thereafter, the probation officer will prepare an

addendum to the report that sets forth any objections that

have been made by counsel, but not resolved, together with

the probation officer's comments.

        The probation officer will certify that the report

and any revisions thereto and the addendum have been

disclosed to you and to all counsel and that the addendum

fairly sets forth all remaining objections.

        Any disputes that exist will be resolved at the

sentencing hearing where both you and the government will

have the opportunity to present any argument and/or

testimony evidence on the disputes.

        Any document related to the sentencing containing

highly-sensitive information, as defined in the

administrative order at Miscellaneous No. 21-50, must be

hand-delivered along with one copy to the clerk's office and

to the attention of Colleen Willison at least ten days prior

to sentencing.

        Sentencing in this case will take place on

1  August 2, 2021 at 10:00.  Is there anything further from the

2  government, Ms. Smolar?

3          MS. SMOLAR:  Nothing further, Your Honor.  Thank

4  you.

5          THE COURT:  Mr. Comber?

6          MR. COMBER:  No, Your Honor.  Thank you.

7          THE COURT:  Okay.  So Mr. Prihar will remain

8  incarcerated, and I will see you in August.  Thank you all

9  very much.

10          MR. COMBER:  Thank you, Your Honor.

11          THE DEFENDANT:  Thank you, Your Honor.

12       (Court was adjourned.)

13

14                C E R T I F I C A T E

15       I, Amanda M. Williamson, certify that the foregoing

16  is a correct transcript from the record of proceedings in

17  the above-titled matter.

18  S/Amanda M. Williamson  _____

19

20

21

22

23

24

25