IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:19-cr-115 |
| | ) | |
| v. | ) | (The Honorable Donetta W. Ambrose) |
| | ) | |
| TAL PRIHAR, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

AND NOW comes Defendant Tal Prihar, by and through his attorney Michael A. Comber, Esquire, and the law firm of Reisinger Comber & Miller, LLC, and respectfully presents this Sentencing Memorandum and attached Letters of Support for the Court's consideration in determining an appropriate sentence.

I. Introduction

Defendant Tal Prihar is a 39-year-old husband and father to four young children living in Israel. He has been married for thirteen years, been a father for eleven, and been a constant presence in his family. He has not seen his wife or children since February of 2020. He was arrested at an airport in France, in front of them, while traveling, and has been in various jails and prisons since then.

Mr. Prihar acknowledges that his conduct led to this. This is why he voluntarily waived extradition to the U.S., promptly agreed to plead guilty, and is forfeiting an enormous sum of perceived gains. But continued confinement in the U.S. deprives Mr. Prihar and his family unnecessarily of his presence in their lives, and it is causing incalculable harm to all of them. For

1

these reasons and the many others in this Memorandum, we respectfully submit that a variance to a sentence of time served, or 34 months accounting for customary foreign confinement credit, would be sufficient, but not greater than necessary, to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553, and we ask the Court to impose such a sentence.

## II.     Legal Standards

A court should impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). In making its determination, a court considers, among other things, (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to afford adequate deterrence and protect the public; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) pertinent policy statements by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. *Id.*

The United States Sentencing Guidelines are one advisory factor in this analysis. *United States v. Booker*, 543 U.S. 220 (2005). The fundamental sentencing responsibility is to "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 50 (2007). Thus, a sentencing court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Id.* at 50.

## III.    Argument

We believe several of the § 3553(a) factors are most pertinent for Mr. Prihar, and we address them separately below. They incorporate a motion for a variance, and together under

the full facts and circumstances, we respectfully submit that they support the requested sentence of time served.

      a)      *Nature and Circumstances of the Offense*

The nature and circumstances of the offense to which Mr. Prihar pleaded guilty are set forth in detail in the Indictment, multiple Department of Justice press releases, Wikipedia, and international news articles. Depending on the source of information, however, the characterizations of Mr. Prihar and the offending website – DeepDotWeb – vary considerably. The Department of Justice described DeepDotWeb as a "broker for illegal Darknet marketplaces," and a "gateway to facilitate the illegal purchase of items."[1] Wikipedia described it as "a news site dedicated to events in and surrounding the dark web featuring interviews and reviews . . . and related news," while other websites described it as a referral service.[2] Similarly, the U.S. Attorney's office characterized Mr. Prihar's role as "extract[ing] a fee" for each link a customer followed (as if he took it by force), while PCMag described him as engaging in "affiliate marketing" (as if the website implemented a common referral fee and it was "not illegal to post a link to a black market site").[3]

---

[1] United States Attorney's Office for Western District of Pennsylvania, Press Release, "DeepDotWeb Administrator Pleads Guilty," dated March 31, 2021, *available at* https://www.justice.gov/opa/pr/deepdotweb-administrator-pleads-guilty-money-laundering-conspiracy (last accessed January 18, 2022).

[2] Wikipedia, "DeepDotWeb," *available at* https://en.wikipedia.org/wiki/DeepDotWeb (last accessed January 18, 2022); United States Attorney's Office for Western District of Pennsylvania, Press Release, "Administrators of DeepDotWeb Indicted," dated May 8, 2019, *available at* https://www.justice.gov/usao-wdpa/pr/administrators-deepdotweb-indicted-money-laundering-conspiracy-relating-kickbacks-sales (last accessed January 18, 2022).

[3] Michael Kan, "Feds Seize DeepDotWeb For Taking Money From Black Market Sites," PC Magazine, dated May 7, 2019, *available at* https://www.pcmag.com/news/feds-seize-deepdotweb-for-taking-money-from-black-market-sites (last accessed January 18, 2022).

Some of these public characterizations of DeepDotWeb and Mr. Prihar's conduct, leaning too far one way or the other, seem to lose sight of the more straightforward and accurate description that is relevant under this § 3553(a) factor. Mr. Prihar earned money from customers who followed some of the links on DeepDotWeb to other websites, and he pleaded guilty because he knew that some of the links led to darknet marketplaces where those customers could purchase illegal items. He did not operate a darknet marketplace, he did not force website visitors to click links, and he did not know which visitors linked to which marketplace or spent their money on which items. In fact, Mr. Prihar did not even set out to operate a referral website for darknet marketplaces. DeepDotWeb began as a news and information resource. It still was at the time of its seizure, and its revenue sources were not solely the referrals or "kickbacks" described by the government, but included other lawful enterprises.

Mr. Prihar does not offer this as a justification or excuse – DeepDotWeb made access easier, and there were referrals paid for those who chose that access. But it is important to Mr. Prihar, and in our view to an accurate analysis of this §3553(a) factor, that the exact nature and circumstances of DeepDotWeb and Mr. Prihar's conduct be understood instead of the many public characterizations of it. Mr. Prihar knows that he profited from the referrals, and as a result he has pleaded guilty and agreed to forfeit all of the proceeds, bank accounts, cryptocurrency, and other property.

Mr. Prihar was taken into custody on May 6, 2019, in France. He was traveling with his family home to Brazil, where they resided at the time, from a visit to Israel, where their extended families and friends lived. On a layover in Paris, Mr. Prihar was arrested, taken to a police station,

and soon placed in a Parisian jail reserved for – as best we can tell – some of the worst of international prisoners in France.

Mr. Prihar spent the next seven months or so in a foreign jail, neither understanding nor understood in terms of language or culture. He found a Jewish community to socialize with, and attempted to avoid conflict. He eventually transferred to a second French prison, with better food and facilities, and from there he was able to accomplish his extradition to the United States.

Mr. Prihar consented to extradition to face these charges and the likely prison sentence they would carry. He pleaded guilty to the first Count of the Indictment – money laundering – to resolve the case and accept responsibility for his part in DeepDotWeb. He agreed to forfeit all of the proceeds of DeepDotWeb, multiple cryptocurrency accounts, multiple bank accounts, the domain and its contents, and personal property. And he knows he may face additional (and he has already spent much) time in prison.

In total, by the time Mr. Prihar is sentenced, he will have spent approximately 33 months incarcerated in foreign countries: 17 months, 11 days in French jail, and 15 months, 9 days in U.S. pretrial detention.

    b)    *History and Characteristics of the Defendant*

Along with offense characteristics, "the history and characteristics of the defendant" is the first sentencing factor listed in 18 U.S.C. § 3553(a). Mr. Prihar's history and characteristics arise out of his upbringing in Israel and his family, and they are unique and compelling.

Mr. Prihar was born in Nahariyya, Israel, in 1981, and was raised in Ma'alot, Israel, two cities in the north of the country kilometers from the Lebanon border. His father worked in factories, and his mother worked in the security industry.

Mr. Prihar recalls a traditional, quiet childhood near the mountains. His memory is positive and modest, characteristic of his personality. In fact, in 1982, Israel launched Operation Peace for Galilee, later known as the First Lebanon War, a security operation by Israel forces in southern Lebanon. The conflict surrounding the war touched much of northern Israel, with rockets landing in and around Ma'alot, and it resulted in civilian casualties. Mr. Prihar and his family spent some time in shelters. Perhaps Mr. Prihar doesn't recall it as a major part of his childhood because of his personality, or because the environment of conflict was part of his childhood routine.

At the age of six, Mr. Prihar moved to a nearby city of Kfar Vradim. Mr. Prihar was raised in Kfar Vradim, attended school there, and to this day his parents live there. Now they are both retired and, incredibly unfortunately, both recovering from cancer. When Mr. Prihar was young, his father worked at a factory assembling computer chip boards with soldering pens, and he would bring home pieces. Mr. Prihar was fascinated. He began developing an interest in electronics and computers, and knew from the beginning that he had an aptitude for it.

At the age of 18, Mr. Prihar entered compulsory military service, and served on the Lebanese border. He was eventually discharged for medical reasons, completed his high school diploma nearby, and then, like many young men, traveled abroad. For two years he lived and worked in England – in Manchester, Birmingham, and London – socializing in rooted Jewish communities and working odd jobs in sales, seasonal mall work, and a kosher supermarket.

When Mr. Prihar returned to Israel, he traveled to Jerusalem. For approximately a year, he lived and studied religion with other members of the Orthodox community. Although he is no longer Orthodox, a devotion to the community and the lessons it taught him stuck with him

since, as reflected in the letters from his Rabbis and family and community members. *See, e.g.*, Exhibit A (Letters from Phillipe Chelly, Shlomo Goldfarb, and Amichai Marinovsky). It was certainly deeply held when he then returned to the north of Israel, to a town called Tzfat (Safed) in the mountains above the Sea of Galilee. There, he met his wife, Mor.

Mor says that as soon as she met Mr. Prihar, she knew that he would be her husband. He was smart, generous, and they had interesting conversation. In fact, they had nothing but interesting conversations in public places for six months – they held to religious beliefs about relationships – when they decided to marry. But that allowed them to find and grow a deep intellectual and emotional bond. They are very different in some ways, she an extrovert, he an introvert, but they connected on such a level that these differences became a strength.

Much of it had to do with Mr. Prihar's nature. Mor recognized that he is a deeply "caring and loving" individual, and throughout his life it has shined in his interactions with everyone:

- "The most outstanding thing about Tal is his willingness to help others, the way he wants everyone to feel good and goes out of his way to make sur everyone has what they need." Letter from Yafit Hazan.

- "We saw right away that Tal was a man that honors others and gives them the honor, and it is all done out of good manners and humbleness. . . . Tal always donated to the needy and anybody who asked help from Tal, he did so happily." Letter from Lilah Hoter-Yishai.

- "Tal is a precious person; he is of great value for the community and society. Kind, devoted, who has a good and big heart. He is diligent and caring. He helps others and does good to them." Letter from Elhonon and Esty Lerer.

- "Another thing that is very special about Tal – his sensitivity to others: he very much likes to see that the people that surround him are happy and satisfied. I remember, how he would stay at the Chabad House to clear the table at the end of the meals and how our children would love to hug him and tell him about their experiences. I remember that he was a lending air to people who had it harder in life who came to be a guest at the Chabad House." Letter from Amichai Marinovsky.

7

- "My dad thinks of everyone not just himself." Letter from oldest child.

Mr. Prihar and his wife moved to the center of Israel for several years – to Petach Tikva and then Rosh Haayin, both to the east of Tel Aviv – and Mr. Prihar worked jobs in internet marketing. Most importantly, Mr. Prihar and his wife grew their family. They had their oldest son in Tzfat, right before moving to Petach Tikva. In Petach Tikva, they had their second oldest, a daughter. In Rosh Haayin, they had their third, a daughter. Later, they moved to Brasilia, Brazil, for two years, and a fourth child, another daughter, was born.

The Prihars now have four children:



For Mr. Prihar, his family is the center of his life. Everything revolves around his wife and children. He would describe his adult life as thirteen years of marriage and family, and he has done everything possible to spend 24 hours a day in it. He has always tried to work stay-at-home jobs, so he could do the daily routine with everyone – school pick-ups and drop-offs,

extracurricular activities, spontaneous outings. Before his arrest, he viewed his family as almost completely and blessedly ordinary, spending their time in nature, traveling to the beach, shopping, watching movies, playing on their phones. But he recognizes that's not completely true – his children were able to attend some primary school in Brasilia, and learn Portuguese, and most importantly they *always* had their father around.

Mr. Prihar's wife views his role in their lives the same way. She wants the Court to know, and will tell the Court, how much she cares for him and wants him to return to their family. This is not only because of his role in their children's lives. He takes care of everyone, including her, always ensuring she has what she needs and is happy, and making certain that, despite their four children, they have time each week for just the two of them.

These are not just highlights or moments; they were the fabric of the family. Every letter about Mr. Prihar emphasizes his devotion to his family, not only in his heart, but in his actions every day:

- "Tal was and still is a very involved father he took part in every aspect of the kids life. From dressing, bathing, feeding to playing, going out on trips and helping with any issues the kids need help with. He is a very caring loving father." Letter from Danna Calev.

- "Tal is a very devoted loving family man. Very close with his wife and kids a very loving warm family man." Letter from Yafit Hazan.

- "Throughout the years we really noticed that he is a warm and loving family oriented person, who respects my sister, helps her in raising the children and all the housework." Letter from Lilah Hoter-Yishai.

This is why Mr. Prihar's arrest, and now his near-three years of incarceration, have been devastating to the family. After being a constant presence, Mr. Prihar has had no presence at all. He has been in French and U.S. prisons since his arrest, and the void has been intensely felt.

At the time of Mr. Prihar's arrest, the family was living in Brasilia, and returning there from a visit to Israel. Mor was left alone with the children in Paris. She did not speak French or English, and did not know what to do. Gratefully, the news of the arrest hit Israel, and a Rabbi immediately called Mor to check on her. The Rabbi told Mor not to get on the plane to Brazil, but to come back to Israel, where Mr. Prihar's family, friends, and community – and hers too – could support her. Mor spent the next 12 days in hotels in France, assisted by the Rabbi's family, whose wife eventually flew to Paris to help Mor return to Israel with the children. When Mor and her four children finally arrived back in Israel, the friend had arranged for them to live in a small house in Kfar Vradim. They are still in Kfar Vradim today.

The community's assistance to Mr. Prihar's family during his absence has been exceptional, and in some ways reciprocates Mr. Prihar's contributions to and presence in that community before being arrested. But none of that replaces Mr. Prihar. There is no soft way to put it, but Mr. Prihar's children are suffering greatly. The oldest, 12 years old and now the only male in the family, had an extremely strong bond with his father, and since the arrest has felt an unshakeable loneliness. The second, 10 years old, outgoing and beautiful, refused to speak to anyone about her father for months after his arrest, afraid of what they might say, until an intervention with a psychologist, a teacher, and her school principal. The third, a sensitive 6-year-old who had a strong emotional connection with her father, cries often, and asks the other children at school to pray for her father to return as soon as possible. The fourth and youngest was only one year old when Mr. Prihar was arrested, but insists that she remembers and misses him (from pictures and the stories her siblings and mother tell her). When her mother goes to pray, she'll tell anyone who will listen "my mom go to pray that my dad come home!"

All of the children attend psychological therapy now. Given the size of the void created by Mr. Prihar's absence, processing it has been nearly impossible. Close observers describe it as best they can:

- "[T]heir life's turned over. They talk to him on video calls and tell them about their day, but there hearts are shuttered. They miss his presence. . . . [H]is oldest . . . developed a very defensive sensitive look on life and finds it very difficult to find his place in class. His daughter . . . very often finds herself in a position she can't deal with since she is so broken over what happened with her Dad. . . ." Letter from Danna Calev.

- "He is missed greatly by his wife and children, who love him so much and need him for their daily functioning. . . . Tal devoted so many hours to his family and this is lacking terribly to his wife and children who are having a hard time functioning without their loving figure." Letter from Elhonon and Esty Lerer.

- "His absence is so big to me and especially to the children. . . . My children all go to emotional therapist for the difficulties it causes them. It hurts a lot to see that our youngest daughter who is 4.5 does not know her father and holds on to photos of them together, and to the video calls." Letter from Mor Prihar.

On top of this, Mr. Prihar's case generated international publicity, and so his children constantly feel the anxiety of eyes on them, questions about their father, and a pressured atmosphere that they don't understand. They are behind in school; Mr. Prihar was the parent who assisted with homework and education. There are many who would treat Mr. Prihar's children as if they are their own – his friends, their religious community – but none of them are Mr. Prihar. Mr. Prihar "is an essential part of there lifes and they need him home, to grow healthy and strong." Letter from Danna Calev.

It would take some effort, but if asked, and asked again, Mr. Prihar would describe how he is also suffering greatly. He knows the role that he had in his family's life, misses his family deeply, and acutely feels the responsibility of regret of what he did to cause all of this. For the first two years of his incarceration – in France and as he was transferred to the U.S. – he had no

11

resources for mental health support. He constantly confronted (or more accurately did his best to avoid) anti-semitism and cultural misunderstandings in jail, where he did not speak the same languages, come from the same backgrounds, or practice the same cultural routines as the other inmates. In Butler County Prison, Mr. Prihar is the only inmate of Jewish faith. His asthma does not feel well treated, and his wife is constantly worried about his physical health.

Mr. Prihar's wife looks forward, for his health's sake, to the days when he can return to eating healthy food, wearing himself out with the children while she cooks it, and then wearing himself out again on hikes and trips with someone on his back.



She and everyone else in their community also look forward to a return soon because the oldest child, Mr. Prihar's son, turns thirteen ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. He will have his Bar Mitzvah, and earn all the rights and obligations of a Jewish adult. He will attend synagogue, read from the Torah, and celebrate his coming of age. It is a singular milestone. He desperately wants his father to be there. So does the rest of his family and the entire community.

- "[H]is importance to the kids well being are beyond words and there need for his presence is essential to there lifes."  Letter from Danna Calev.

- "An exceptional family, united in hardship and ready to support Tal in his desire to move forward in a peaceful life. . . I really think that Tal would be much more useful to society if he is free . . . ."  Letter from Phillipe Chelly.

- "I firmly believe that for the sake of the cause, for the benefit of his family and children, Tall will be able to embark on a new and beneficial path both for himself and his family by returning to them / us."  Letter from Shlomo Goldfarb.

- "Please your honor we beg you to find it in your heart to send our son home."  Letter from Micha and Dalia Prihar.

- "Please act, that Tal should come home to his children that miss him so much . . . ."  Letter from Amichai Marinovsky.

- "We need him home I am asking you from the bottom of my heart to please let my husband come home as soon as possible."  Letter from Mor Prihar.

The healing and rehabilitative value of Mr. Prihar's presence would be immeasurable for everyone who knows Mr. Prihar and his family.

    c)    *Need for the Sentence Imposed to Serve the Purposes of Sentencing*

The purposes of a sentence include punishment of the criminal conduct, deterrence from additional commission of crime, protection of the public, and rehabilitation of the defendant. *See* 18 U.S.C. § 3553(a). In Mr. Prihar's case, most of these purposes have already been served by his guilty plea and acceptance of responsibility, the time he has spent in

multiple prisons in two foreign countries, and the substantial forfeitures he agreed to. These consequences have punished Mr. Prihar, they have deterred him, and they set him on a course of rehabilitation. If after this there is still additional need to serve the purposes of sentencing, it could be accomplished only by additional imprisonment, and we cannot conceive of how that would be consistent with the overall facts and circumstances.

Additional imprisonment might add to Mr. Prihar's punishment, but the addition would be far more than necessary. Mr. Prihar has already served nearly three years in prison, and his incarcerated time has worked a greater hardship than most. He was taken from his family while traveling, on a layover in Paris. He was placed in a jail full of international prisoners, tension, and violence. Now in the U.S. after extradition, he has had minimal religious support, and has not been able to see his family in person at all because of Covid and travel restrictions. From his perspective, he has spent every day of his confinement in a foreign country, forced to communicate in foreign languages, and adapting to foreign customs.

Additional imprisonment might add to general deterrence, but that addition would also be far more than necessary. Mr. Prihar's case has been in the news since his arrest, guaranteeing that more time in prison is not needed to get the word out. The Department of Justice has publicized his indictment, plea, and conduct, ensuring that by his capture, extradition, and guilty plea alone, the message of consequences is sent. On the date of the indictment, the FBI applauded "the efforts of federal and international law enforcement," which "should *send the message* that we are coming after the operators of these dangerous

websites."[4]  On the date of Mr. Prihar's plea, another press release announced that "today's guilty plea *sends a message* to other cyber actors across the globe who think the dark web is a safe haven."[5]  Acting Assistant Attorney General Nicholas L. McQuaid of the Justice Department's Criminal Division added: "This prosecution, seizure of the broker website, and forfeiture *send a clear message* that we are not only prosecuting the administrators of Darknet marketplaces offering illegal goods and services, but we will also bring to justice those that aim to facilitate and profit from them."[6]  In other words, the prosecution that has already taken place, including a very public arrest and guilty plea, seizure of the website, years of imprisonment, and a substantial forfeiture, has already sent a very clear message to the world about the consequences.  Under the circumstances, we cannot conceive of how additional imprisonment is necessary to further send a message that has been sent, and publicly announced, repeatedly.

> d)      *Kinds of Sentences Available and Motion for Variance*

A criminal sentence can come in many forms, including incarceration, restitution, forfeitures, and fines.  18 U.S.C. § 3553(a).  In Mr. Prihar's case, his sentence has already included nearly three years of incarceration and substantial forfeitures of money, bank accounts, and personal property.  No fine or other kind of sentence is necessary.

---

[4] United States Attorney's Office for Western District of Pennsylvania, Press Release, "Administrators of DeepDotWeb Indicted," dated May 8, 2019, *available at* https://www.justice.gov/usao-wdpa/pr/administrators-deepdotweb-indicted-money-laundering-conspiracy-relating-kickbacks-sales (last accessed January 18, 2022).
[5] United States Attorney's Office for Western District of Pennsylvania, Press Release, "DeepDotWeb Administrator Pleads Guilty," dated March 31, 2021, *available at* https://www.justice.gov/opa/pr/deepdotweb-administrator-pleads-guilty-money-laundering-conspiracy (last accessed January 18, 2022).
[6] *Id.*

In fact, we respectfully move for a variance downward to time served for all of the reasons above. His generous and caring conduct toward others, his active fatherhood, and his contributions to and regard in his community, are all factors recognized as "reasons to justify [a] downward variance." *United States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008). More to the point, in their light, Mr. Prihar's already-served sentence of imprisonment and forfeitures has sufficiently but not more than necessary served the purposes of sentencing.

In addition, Mr. Prihar spent all of his incarcerative time in prisons foreign to him, and most of it in prisons foreign to the rest of us, warranting a further variance. Mr. Prihar's detentions have been hardships greater than is typical. In France, he served seven months in an international jail, and nine more in a prison. He gets no credit for his sudden arrest and placement in jail being unexpected, although that magnified the hardship for him and his family, but he should receive variance consideration for just how difficult the time incarcerated was because of the type of inmates, quality of care, and language and culture barriers. Despite this, Mr. Prihar was "caring and comforting with the most needy and respectful of all. Often all these people who knew him in prison still ask me if I have any news from him." Letter from Phillipe Chelly.

From Mr. Prihar's perspective, his time in the U.S. has similarly come with consequences that are more burdensome than typical. This includes not only language and cultural barriers, but also the Covid pandemic. As the Court well knows by now, Covid has not just interrupted family visits – quarantines, reduced medical care access, nonexistent socialization, and other Covid mitigation measures have made confinement significantly more "laborious and difficult" than usual. *See, e.g.*, *United States v. Walls*, 2020 WL 6390597, Case

16

No. 2:16-cr-00249 (W.D. Pa. Nov. 2, 2020) (discussing grant of variance in part because "harder time" counts for more, and a sentencing court must "consider the entire picture as it exists now"). Mr. Prihar even contracted Covid while at Butler County Prison, while suffering from Asthma. Altogether, these conditions warrant a variance to account for the hardship.

To reach a sentence of time served, the variance would not need to be extraordinary. One way to fairly measure it might credit two days for each day spent in foreign custody. If that is applied, Mr. Prihar's 17 months, 11 days in French jail, would equal 34 months, 22 days. Additionally, if Mr. Prihar had served his time in a Bureau of Prisons facility, he could have received good conduct, programming, and other credits toward his time served. These benefits are available to many pretrial detainees, and if they had been available to Mr. Prihar, in addition to the "entire picture" evaluation of his time spent in France, he could fairly be considered to have already served more than 54 months in prison. The variance to reach that figure is readily justified by Mr. Prihar's unique history and circumstances, described above. And at bottom, the sentence that is sufficient, but not greater than necessary, to serve the purposes of sentencing, is what Mr. Prihar has already served: years in prison, substantial forfeitures, and the punishments and deterrence of family separation and case publicity among everything else.

### IV. Conclusion

For these reasons and the others presented in this Memorandum and at hearing, including the enclosed Letters of Support, we respectfully ask the Court to impose the requested sentence of time served.

Respectfully submitted,

Dated: January 19, 2022

Michael A. Comber, Esquire
PA ID No. 81951

S. Wesley Gorman
PA ID No. 325565
Reisinger Comber & Miller, LLC
436 Seventh Avenue
Pittsburgh, PA  15219-1827
(412) 894-1380
mcomber@reisingercomber.com
wgorman@reisingercomber.com